# Federal Defenders
## OF NEW YORK, INC.

Eastern District
One Pierrepont Plaza-16th Floor, Brooklyn, NY 11201
Tel: (718) 330-1200 Fax: (718) 855-0760

Leonard F. Joy
*Executive Director and
Attorney-in-Chief*

Eastern District
Peter Kirchheimer
*Attorney-in-Charge*

July 2, 2010

The Honorable Nicholas G. Garaufis
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

**RE: United States v. Devon Bristol, Cr-10-036-NGG/RER**

Your Honor:

I write on behalf of the defendant, Devon Bristol, to brief this Court on the legal issues presented subsequent to the suppression hearing conducted by this Court on May 18, 2010. In our view, the single and consequential legal issue is: whether the arresting officers had reasonable suspicion to conduct a stop of the vehicle within which the defendant was a passenger. A review of the proven facts and legal precedent, see below, shows that the officers lacked reasonable suspicion, and in Officer Narra's own words, were acting on nothing more than a "hunch," Tr. 138-139, that criminal activity was afoot.

## Facts

In the early morning hours of December 30, 2009, Sergeant Eric Konoski ("Konoski"), and Officers Trent Narra ("Narra") and Samantha Cabrera ("Cabrera"), all assigned to the NYPD PSA-2 anti-crime unit, were on patrol in an unmarked car in the 73, 75 and 77 precincts of Brooklyn, New York. Tr. 42. Konoski was the supervising officer. Tr. 39. Narra was the driver. Tr. 112. Their tour of duty began at 6:30 p.m. on December 29, 2009 and was scheduled to end at 2:05 a.m. on December 30, 2009. TR. 112.

On that particular night, Konowski decided that his team would do car stops. TR. 42, 47. Between the hours of 6:30 p.m. on December 29th and 1:20 a.m. on December 30th, the Konoski team stopped approximately eight cars. TR. 11-12. None of the officers could remember exactly how many car stops they made that

night. Tr. 47, 93, 113. No tickets or summons were issues to any of the drivers stopped that night. Tr. 47. No records were kept of any of the other car stops the officer made that night. Tr. 46-47.

At about 1:30 a.m. Narra observed a gold colored Crown Victoria ("the gold car") automobile operating on a city street. Tr. 12-13, 99, 113 The car had New Jersey plates, no markings on the vehicle, a driver and two backseat passengers. Tr. 13-14, 113. Narra had a "hunch" the car was an illegal fore-hire gypsy cab, Tr. 138-139, so he decided to stop the car. Tr. 137.

Devon Bristol was one of the passengers in the gold car. He was seated in the back on the passenger side. Tr. 60. When the gold car came to a stop, Bristol opened the door and tried to step out. Tr. 60. Before he could leave, however, Konoski placed his body in front of the doorway such that Bristol could no exit the car without bumping into Konoski. Tr. 140 -141. Konoski knew that Bristol wanted to get out of the car, and said to Bristol, "You don't have to get out of the car." Tr. 63. Konoski held the door and blocked Bristol's exit. Tr. 63. After Konoski said, "You don't have to get out of the car." Bristol persisted in his intention to exit the car, and told Konoski, "I want to leave." Tr. 66, 69. Konoski maintained his position blocking Bristol's exit from the car. Tr. 69. Konoski claims that Bristol walked into him such that Bristol's chest pushed into Konoski's left forearm. Tr. 70. Konoski felt a hard object on the left side of Bristol' chest. Tr. 70. Konoski felt the object with his left forearm, not his hand. Tr. 70. The object felt hard, heavy and square. Tr. 70. At this point Konoski told Bristol to stop, saying "I want to make sure you don't have any weapons on you." Tr. 70. Bristol kept going. Tr. 70. Konoski tackled Bristol and found a gun on Bristol' person. Tr. 71, 72.

None of the officers had ever seen the gold colored car before the stop. TR. 49, 100. None of the officers ran the plates before they stopped the gold car. Tr. 49. There were no radio runs concerning the gold car. Tr. 49. None of the officers recognized the occupants of the gold car or observed any unusual activity inside the gold car. Tr. 49 - 50, 100. The officers could not observe the gender, age, or race of the occupants. TR. 49-50, 100. The officers did not know from where the gold car was coming. Tr 54. None of the officers saw the car accept a hail. Tr. 54. None of the officers knew when are where the occupants of the car got in the car. TR. 54, 99. Nor did the officers know, or ever, learn the destination of the gold car. TR. 54. The gold car was operating in a lawful manner on the roadway. TR. 101. The car was not speeding, or swerving,

nor did the officers observe any failure to signal. TR. 101.

The Crown Victoria is a four door, American made, sedan. TR. 49. It is a type of car that is sometimes, but not always, used as a livery cab. TR. 49-50. In the borough of Brooklyn, all types of vehicles, all makes and models, are known to operate as taxis or cabs. TR. 52, 102. Livery cabs are often, but not always, are sedans, minivans, wagons, vans and SUVs. TR. 52, 102.

## Legal Framework

Under *Terry v. Ohio*, a law enforcement official may temporarily seize ("stop") someone without a warrant if he has some articulable reasonable suspicion to believe that crime is afoot. 392 U.S. 1, 30 (1968). This rule also applies to traffic stops. *See United States v. Stewart*, 551 F.3d 187, 193 (2d Cir. 2009) ("[T]he reasonable suspicion of a traffic violation provides a sufficient basis under the Fourth Amendment for law enforcement officers to make a traffic stop."). An evaluation of whether reasonable suspicion exists is an objective, totality of the circumstances inquiry. *See, e.g., United States v. Arvizu*, 534 U.S. 266, 274 (2002) (citing *Terry*, 392 U.S. at 27). A mere "hunch" will not suffice. *See id.; Terry*, 392 U.S. at 21-22; *United States v. Parker*, No. 99-CR-123 (JG), 1999 WL 997282, at *5 (E.D.N.Y. Oct. 18, 1999). To satisfy the reasonable suspicion standard and justify a stop, police officers must have particularized, individualized suspicion based on specific facts and inferences that would lead a reasonable person to suspect criminality. *United States v. Arvizu*, 534 U.S. 266, 273 (2002); *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). So long as there is an objectively reasonable basis for stopping the car, the officer's actual, subjective motivation is unimportant. *United States v. Whren*, 517 U.S. 806, 813 (1996).

## Argument

On December 30, 2009, at about 1:30, the anti-crime team of Konoski, Narra and Cabrera observed an American made, four door sedan, traveling on a city street in Brooklyn, New York. The car had New Jersey license plates. The car was occupied by three people, one driver and two back seat passengers. On the basis of these observations officer Narra decided to conduct a car stop. In his own words, Narra was acting on a "hunch" that the vehicle was being operated as a vehicle for hire.

The specific facts that Konoski, Narra, and Cabrera that relied on the stop the gold car were (1) the New Jersey plates; (2) the make and model of the car; (3) the occupants were a

driver and two back seat passengers; and (4) the car lacked any signs or stickers or lights indicating that it was a vehicle for hire.

The fact of New Jersey plates is of no consequence in the reasonable suspicion analysis. New York City has millions of residents and draws people from all over the country and all over th world. The State of New Jersey is in close proximity to the City of New York and the Borough of Brooklyn. It is not remotely unusual or suspicious to see a car with New Jersey plates operating on the streets of Brooklyn.

The make and model of the car is of no consequence in the reasonable suspicion analysis. The Crown victoria is a large American made sedan. It has no particular specific association with the livery cab industry. Livery cabs come in all makes and models. It is not remotely unusual to see a Crown victoria operating on the street of Brooklyn.

The fact that the gold car had no commercial signs or plates or stickers or lights indicating that it was a car for hire undermines any reason to suspect that it was a car for hire. Indeed, in order to operate as a car for hire and solicit passengers, a livery car has to be identifiable as a livery cab. Otherwise potential passengers would not be likely to seek a ride from the car, for two obvious reasons: one, potential passengers would think it was a private car and not a car for hire; and, two, most potential passengers would be loath to hope into just any car, not knowing whether it was a cab or a private car.

The only notable fact is that the occupants of the car were a driver and two back seat passengers. The officers, however, did not know the age, race or gender of the occupants. They observed nothing unusual or remarkable about the driver or passengers. This simple fact of passenger location is insufficient to establish reasonable suspicion that crime is afoot. People are free to sit where they please when in a car. Most people would be shocked and aggravated to find themselves subject to a police stop because the front passenger seat of their car was empty. No case law supports a claim that the mere positioning of passengers within a car leads to reasonable suspicion that a care is an illegal car for hire, and no reasonable person would believe that a car is an illegal car for hire simply because of the position of the passengers.

## Conclusion

On the basis of the facts in the record, it is clear that

the officers who stopped the car within which Devon Bristol was a passenger lacked reasonable suspicion to believe that car was operating as an illegal car for hire. The gun seized from Bristol's person and Bristol's subsequent statement to the police on December 30, 2010, should therefore be suppressed.

Thank you for your attention.

Respectfully submitted,

Heidi C. Cesare, Esq.
Assistant Federal Defender
718-330-1257
heidi_cesare@fd.org

cc: Clerk of the court (by ECF)
AUSA Celia Cohen
Devon Bristol